IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN THE MATTER OF THE SEARCH OF
The Apple iPhone associated with the number
614-929-8970

Case No. 2:25-mj-613

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, **Kyle Spence** being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—an

electronic device described more fully in Attachment A (the "Subject Phone")— and the

extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation and have been

since October 20th, 2023.  I am currently assigned to the Cincinnati Field Office, Columbus

Resident Agency. I am responsible for conducting complex financial crime investigations.

Before my assignment in Cincinnati, I spent four months at the FBI Training Academy in

Quantico, VA, where I received training in a variety of investigative and legal matters, including

the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable

cause.

3.      This affidavit is intended to show only that there is sufficient probable cause for

the requested warrant and does not set forth all my knowledge of, or investigation into, this

matter. The facts and information contained in this affidavit are based on my personal knowledge, my training and experience, interviews of various witnesses, including law enforcement personnel who participated in this investigation, and my review of certain records and documents.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be seized is an Apple iPhone associated with the number 614-929-8970 (the "**Subject Phone**").

## PROBABLE CAUSE FOR THIS SEARCH

5. On or about October 20, 2022, the FBI Cincinnati/Columbus RA Field office was contacted by Kimbally Wright (Wright), Director of Corporate Security at ADT Security Services. ADT reported that Direct Communications Sales LLC (DCS), a third-party reseller of ADT security systems, physically located at 3369 Indianola Ave, Columbus, Ohio, 43214, had potentially created fraudulent accounts to earn commission sales from ADT.

6. On or about October 25, 2022, Columbus RA FBI received records from ADT, which showed that Direct Communications LLC is owned by Klaudio Pali (Pali), the CEO of the company.

7. On or about January 28, 2025, SA Spence conducted a record check of Direct Communication Sales LLC, which showed Pali as the Registered Agent of the company.

8. On documents provided by DCS to ADT, which included registration information for DCS, the **SUBJECT PHONE NUMBER** is listed as the primary phone number for the company. According to ADT representatives, DCS used directcommunicationsohio@gmail.com. to communicate business transactions, including security system account information.

9.      On October 24, 2025, SA Spence reviewed documents provided by AT&T. Records show that that between May 11, 2018, to January 2, 2024, the **SUBJECT PHONE NUMBER** was assigned to Klaudio Pali at 294 E. Whittier St, Columbus, Oh, 43206. On January 1, 2024, the **SUBJECT PHONE NUMBER** was Ported Out to another cell phone provider.

10.      On or about October 24, 2025, SA Spence reviewed documents provided by Apple Inc. Records show that several apple devices had been registered to Klaudio Pali using the **SUBJECT PHONE NUMBER**. The last registration was listed as an iPhone Pro Max using the **SUBJECT PHONE NUMBER.**

11.      A review of ADT security system records for account created by Direct Communication sales with ADT revealed the following:

      a.  In approximately nine months from January 1 to September 22, 2022, DCS opened approximately 439 new ADT accounts in Ohio after having only opening approximately 99 new accounts between 2019 and 2021 for ADT.  Such a dramatic increase in sales in such a short time is extremely unusual and suggests fraudulent activity.

      b.  Approximately 430 of the 439 new accounts in Ohio had a different homeowner than the customer listed on the security contract, also suggesting that the accounts were not legitimate.

      c.  Approximately 429 of the 439 new accounts had no system activity, indicating that the security systems for the accounts were not actually installed.

      d.  Approximately 399 of the new accounts had repetitive two factor Device IDs.

e. Approximately 81 of the new accounts had non-repetitive IP Addresses for login but still showed repetitive Device IDs.

f. ADT estimated DCS received approximately $874,000.00 in commission for the 439 new accounts.

g. ADT was told by DCS that DCS purchased their ADT panels through another dealer; Each active account should have a separate panel; however, the device ID addresses associated with these panels showed that DCS used and reused approximately 8 - 10 panels for all the accounts.

12. On January 27, 2025, SA Spence reviewed information provided by ADI Global Distribution (ADI). ADI sales indicate that from January 1, 2022, to September 2, 2022, DCS/Pali purchased approximately 635 ADT modules that are inserted into the rear of the security panel and retains the customer information when registered. During the same period, only 18 security panels were purchased. This suggests that DCS was creating fraudulent account transmissions with the modules while using and reusing the same security panels.

13. Records obtained during the course of the investigation showed that DCS somehow gained access to consumer information and used this information to get passing credit scores for fake alarm accounts. Although it is unclear how Pali obtained the consumer information - ADT determined that DCS attempted multiple queries to get a valid credit score for consumers. This was accomplished by using different naming conventions and the last four numbers of an SSAN on Equifax files.

14. DCS sales reps then created unique fake emails in the stolen victim's name to avoid ADT's multi email report and flag system. Each email contained the name of the victim,

followed by a 3-4 number variation, such as Janedoe3472@outlook.com. Several victim interviews that were conducted noted that the emails had never been used by the victims.

15.    During the customer registration process, Docu-sign was used to digitally sign the ADT contracts. This included accessing the unique fake emails, along with a one-time passcode that should have been sent to the customer's phone. However, in approximately 88 accounts, the one-time passcode was sent to the **SUBJECT PHONE** number.

16.    Evidence collected during the investigation revealed that DCS did not install any panels, but rather, Pali sent signals to ADT through his home, or another location, to make it appear that the account was online/valid.  Pali also used 8-10 panels repeatedly to open the fraudulent accounts.

17.    Since approximately January 1, 2024, SA Spence reviewed documents provided by ADT showing the customer accounts created by DCS. For approximately 80% of the customer accounts created by DCS, the panels showed no activity following activation. IP addresses for multiple customers showed the exact same IP address, even though the address listed for each customer is different.

18.    Financial records obtained during the investigation showed that Pali paid the initial fees themselves.  This was done using unique payment methods, to include virtual card products.  The virtual cards were set up and tied to a single credit card.   This activity avoided the multi credit card report/flag system and kept the accounts from being past due, avoiding the daily non-pay reports and concealing the identities of Pali or other DCS rep.

19.    On or about February 13, 2024, SA Spence received and reviewed documents provided by Lithic (AKA Pay with Privacy). Pay with Privacy is a virtual credit card company that allows the owner of the account to create virtual credit cards that are then billed to a

connected bank account. Records showed that Pali opened an account with Lithic on or about October 20, 2021, and connected his personal and business JP Morgan Chase accounts. Pali provided business documents which included a 2020 tax return, articles of incorporation, and bank statement for DCS.

20.     A continued review of Pay with Privacy shows that approximately 586 Virtual credit cards were created by Pali from account opening. Approximately 500 of the virtual credit cards listed the names of customers that ADT had reported as part of the fraudulent customer sign-ups. Several of the customers had multiple virtual cards attached to their name.

21.     Interviews were conducted by SA Spence with approximately 5-10 elderly victims listed as customers for DCS. During the interviews, all the victims stated that they had never head of DCS, nor had security systems installed by the company. None of the victims recognized the name of Klaudio Pali. The victims also stated that they did not/had not lived in the residences listed on the contracts.

22.     On or about June 2022, Klaudio Pali assisted Athie Benevenuto in being hired to work as part of Alarm Guard services. After being hired, Benevenuto began signing up new customers that matched the names of customers signed up by Klaudio Pali. Listed on approximately 35 of the accounts associated to sales made by Benevenuto was the **SUBJECT PHONE NUMBER.**

23.     On October 21, 2025, a federal grand jury for the Southern District of Ohio indicted Klaudio Pali with nine counts of wire fraud in violation of 18 U.S.C. §1343 and one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §1349, Case No.: 2:25-cr-00175. In the same indictment the grand jury charged Athie Benevenuto with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. 1349.

24. On October 23, 2025, both Pali and Benevenuto were arrested. A custodial interview was conducted of Athie Benevenuto. During the interview, Benevenuto indicated that he primarily spoke with Klaudio Pali via phone and text message and that he was instructed by Pali on how to create fake ADT security system accounts and how to use Pay with Privacy. Benevenuto stated that there was an agreement with Pali that he would send 50% of his profits from the fake accounts to Pali. Pali provided guidance to Benvenuto on how to finalize the ADT contracts and setup the panels. Benevenuto repeatedly referred the creation of these fake contracts as Pali's "process".

25. On October 23, 2025, during the arrest of Klaudio Pali, your affiant asked Klaudio Pali for consent to retrieve his passport and his cell phone from the residence, at which point he declined consent.

26. Following the arrest, Pali declined to be interviewed. During the normal processing of prisoner information post interview attempt, Pali confirmed the **SUBJECT PHONE NUMBER** as his primary phone number.

27. Based on my knowledge, training and experience, I know that cell phone users keep their cell phones physically on or near their person at all times. Pali currently resides at 294 E. Whittier St, Columbus, OH, 43206 and therefore the **SUBJECT PHONE** is likely to be located in the Southern District of Ohio.

### *Use Of Cell Phones*

28. Based upon my training and experience, I know that cellular telephones may contain evidence relevant to the Target Offenses. For example, text messages and similar communications on messaging apps that are made or received from the **SUBJECT PHONE** that are located in its memory may provide information regarding the identities of, and the methods

and means of operation and communication used by, any participants in the offenses that are the subject of this investigation. Moreover, digital photographs located in the memory of the **SUBJECT PHONE** may contain images of the tools or participants involved in the offenses that are the subject of this investigation. Also, digital photographs stored in the **SUBJECT PHONE** may contain images of the user of the **SUBJECT PHONE**, the user's associates (including persons involved in or knowledgeable about the Target Offenses), places frequented by the user of the phone leading up to and during the Target Offenses, and locations and instrumentalities used in committing the Target Offenses .

29.     In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

30.     Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (e.g., location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offenses under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

31.     Individuals involved in criminal offenses also often store telephone numbers and names or nicknames of fellow conspirators on their telephones, and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. In my experience and in the experience of other agents, defendants use cell phones to contact other participants in their criminal conduct. There is probable cause to believe the **SUBJECT PHONE**, described further in Attachment A, contains evidence of violations of the Target Offenses.

32.     Additionally, based on my training and experience, I know it is common for those engaged in criminal activity to obtain and use one or more "burner" cellphones that are not directly attributable to the criminal actor through subscriber records – that is, a cellphone subscribed in an alias name or in the name of a third party – to engage in and facilitate criminal conduct. Criminals also frequently use multiple cellphones as a means to compartmentalize communications; for example, using one cellphone to communicate with the government and

other entities involved in billing for, and receiving funds derived from, claims for health care services; but using another to communicate with those conspiring to fraudulently submit claims and obtain such funds. Finally, it is not uncommon for those participating in criminal activity to maintain a "clean" cellphone used principally to communicate with others – such as family members or friends – who are not engaged in criminal activity.

## TECHNICAL TERMS

33.　　Based on my training and experience, I use the following technical terms to convey the following meanings:

　　　　a.　Wireless telephone:　A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.　These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.　A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.　In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.　These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.　Wireless telephones may also

include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some

GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

34. Based on my training and experience, I know that some of the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

35. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

36. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file

system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37.   *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file

systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device, that electronic device could serve both as an instrumentality for committing the crime, and also as a

storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

38.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

39.     The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.

These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

        b.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

        c.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

        d.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's

contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric

features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

       h.    Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

### CONCLUSION

40.    I submit that this affidavit supports probable cause for a search warrant authorizing the collection and examination of the **SUBJECT PHONE** described in Attachment A to seek the items described in Attachment B as evidence of the Target Offenses identified in the Indictment filed on October 21, 2025.

Respectfully submitted,

KYLE
SPENCE

Digitally signed by
KYLE SPENCE
Date: 2025.10.29
13:58:16 -04'00'

Kyle Spence
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on October 30, 2025



Elizabeth A. Preston Deavers
United States Magistrate Judge